503 S.E.2d 483

**GLOBAL PROTECTION CORP., formerly known as The Puria Group, Inc., d/b/a Custom Condoms, Respondent,**

v.

**David HALBERSBERG, individually, and a/k/a King David and d/b/a King David, d/b/a S & M Enterprises, Inc., d/b/a Dave's Beachwear, d/b/a King David Wholesale; S & M Enterprises, Inc. d/b/a King David, and d/b/a King David Wholesale and d/b/a Dave's Beachwear, Appellants.**

No. 2856.

Court of Appeals of South Carolina.

Heard April 7, 1998.

Decided June 23, 1998.

Rehearing Denied Aug. 20, 1998.

B. Craig Killough and M. Dawes Cooke, Jr., both of Barnwell, Whaley, Patterson & Helms, Charleston, for appellant.

Fred B. Newby, of Newby, Pridgen & Sartip, Myrtle Beach; and Wellington M. Manning, Jr., of Dority & Manning, Greenville, for respondent.

STILWELL, Judge:

Global Protection Corporation filed this action against David Halbersberg and his numerous businesses alleging common

law trademark infringement, common law trade dress infringement, civil conspiracy, and unfair trade practices. Judgment was entered against Halbersberg for $1,249,451.38. We affirm in part and reverse in part.

Global developed its novelty glow-in-the-dark condom, called "Knight Light," in 1989 and began marketing it in early 1990. In July or August 1990, Halbersberg purchased boxes of the Knight Light in Myrtle Beach. In 1991 Halbersberg traveled to Korea to find a manufacturer for his own novelty glow-in-the-dark condom called "Love Light." Halbersberg's product appeared on the market in 1992. Although the processes for manufacturing the two condoms are different, the packages are virtually identical. Halbersberg admitted he sent the Korean manufacturers samples of Global's packaging and told the manufacturers he wanted his packaging to be like Global's packaging but did not want the exact wording on the boxes. Halbersberg also admitted selling his product in boxes bearing Global's name.

The case was referred to the master to determine findings of fact, conclusions of law and recommendations with a directive to report such findings back to the circuit court. In his report, the master dismissed the civil conspiracy cause of action but found Halbersberg committed common law trademark and trade dress infringement and that the conduct constituted unfair competition. The master awarded damages of $354,207.05 and trebled these to $1,062,621.15. He also awarded Global reasonable attorney fees with the amount to be determined later.

After reviewing the master's findings of fact, conclusions of law, and recommendations, the circuit court agreed with the portion of the master's report finding Halbersberg liable, but remanded the case to the master to redetermine lost profits and determine the amount of attorney fees, with direct appeal to the supreme court. The second master found Global's total damages to be $935,457.57, awarded attorney fees of $311,-819.19, for a total judgment against Halbersberg of $1,249,-451.38.

## DISCUSSION

"In an action at law, on appeal of a case tried without a jury, the findings of fact of the judge will not be

disturbed on appeal unless found to be without evidence which reasonably supports the judge's findings." *Townes Assocs. v. City of Greenville,* 266 S.C. 81, 86, 221 S.E.2d 773, 775 (1976). "[I]n a law case, the facts found by the judge on the judge's review of the master's report are accepted as final on appeal to either this court or the Supreme Court if the evidence reasonably supports the findings . . . ." *GHMSW Partnership v. Logan,* 310 S.C. 555, 557, 426 S.E.2d 332, 334 (Ct.App.1992). Our standard of review is, therefore, whether there is evidence to support the trial court's findings.

## I.  TRADEMARK

■ The first issue on appeal is whether the trial court erred in finding Halbersberg infringed Global's common law trademark rights. We conclude the judge did not err.

The phrases in question, "Custom Condoms," "Adam and Davin Enterprises," and "I=Boston" appeared on the individual packages and the display boxes of Halbersberg's product. The parties do not dispute that Global was the senior user of these phrases. Although admittedly copying Global's phrases, Halbersberg asserts they are trade names of the business enterprise, not the product itself.

A trademark "means a word, name, symbol, or device or any combination of these used by a person to identify and distinguish the goods of that person, including a unique product, from those manufactured and sold by others and to indicate the source of the goods, even if that source is unknown." S.C.Code Ann. § 39–15–1105 (Supp.1997). Without question, the phrases indicate the product came from a particular source. Halbersberg's argument supports this conclusion. He admits that after he noticed the manufacturers had exactly copied the samples he sent them, he attempted to mark through those phrases.

## II.  TRADE DRESS

The second issue on appeal is whether the trial court erred in finding Halbersberg infringed Global's common law trade dress rights.

■ Based on the allegations of the complaint, this action could have been brought under either the Lanham Act, 15 U.S.C. §§ 1051–1127, South Carolina's Unfair Trade Practices Act (UTPA), S.C.Code Ann. §§ 39–5–10 to –160 (1976), or both. *See Restatement (Third) Unfair Competition* 21 (1995) ("Actions for deceptive marketing are generally brought under § 43(a) of the Lanham Act, 15 U.S.C.A. § 1125(a), or under the various state statutes prohibiting deceptive trade practices.").

We are not aware of a common law trade dress cause of action in South Carolina and we decline to create one here. Global opted to pursue remedies available under the UTPA, but attempted to state a cause of action for common law trade dress infringement. Halbersberg's misappropriation of Global's packaging constituted unfair competition and Global was awarded damages for Halbersberg's wrongful conduct under the UTPA. We see no reason to create a new cause of action to apply to a situation already covered by a federal act and a state act. We therefore hold South Carolina does not recognize a cause of action for common law trade dress infringement independent of the Lanham Act or the UTPA. The master erred in finding Halbersberg liable for common law trade dress infringement.

### III. UNFAIR TRADE PRACTICES

The third issue on appeal is whether the trial court erred in finding Halbersberg violated South Carolina's UTPA which provides: "(a) Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful." S.C.Code Ann. § 39–5–20 (1976).

■ "To be actionable under the UTPA, the unfair or deceptive act or practice must have an impact upon the public interest. Unfair or deceptive acts or practices have an impact upon the public interest if the acts or practices have the potential for repetition." *York v. Conway Ford, Inc.*, 325 S.C. 170, 173, 480 S.E.2d 726, 728 (1997) (citation omitted).

■ The package in question was an exact copy, including the trademarks, of Global's product. Unquestionably, this

practice is deceptive. Furthermore, because the copying produced a substantially identical product, a consumer had no way of knowing the truth about the source of the item in question. Halbersberg testified he sold approximately 48,000 condoms, each of which was deceptive. We think this supports the master's finding that the public interest requirement was met.

In order to recover treble damages and attorney fees under the UTPA, the plaintiff must demonstrate the acts causing the damages were willful. S.C.Code Ann. § 39–5–140 (1976). Halbersberg's own testimony is sufficient to prove he willfully appropriated Global's marks and packaging and he acknowledged he had done the same with other products. We hold the trial court did not err in finding Halbersberg liable for unfair trade practices and trebling the actual damages.

## IV. DAMAGES

The fourth issue on appeal is whether the master erred in awarding $935,457.57 in damages. The master determined on remand the actual damages were $311,819.19, trebled to $935,-457.57. To this amount he added $2,174.62 in costs and $311,819.19 in attorney's fees.

### A. Causation

Halbersberg first disputes that his actions caused Global's injuries. This, however, is a finding of fact not to be disturbed on appeal unless found to be without evidentiary support.

The evidence clearly shows that Global's profits on the East Coast were down in 1991–92, the time in which Halbersberg was marketing his virtually identical product. After Global obtained an injunction prohibiting Halbersberg from using Global's trade dress, Global's East Coast profits increased in 1993. Global had to lower the price of its product to compete. This evidence supports the trial court's finding of causation.

### B. Lost Profits

Halbersberg argues Global's proof of lost profits was speculative.

The law does not require absolute certainty of data upon which lost profits are to be estimated, but all that is required is such reasonable certainty that damages may not be based wholly upon speculation and conjecture, and it is sufficient if there is a certain standard or fixed method by which profits sought to be recovered may be estimated and determined with a fair degree of accuracy.

*Beck v. Clarkson*, 300 S.C. 293, 298–99, 387 S.E.2d 681, 684 (Ct.App.1989) (quoting *South Carolina Fin. Corp. of Anderson v. West Side Fin. Co.*, 236 S.C. 109, 113 S.E.2d 329 (1960)).

In *Drews Co. v. Ledwith–Wolfe Assocs.*, 296 S.C. 207, 371 S.E.2d 532 (1988), our supreme court cited numerous techniques for proving lost profits. Proof may be established through expert testimony, economic and financial data, market surveys and analyses, business records of similar enterprises, comparison with profit performance of businesses similar in size, nature and location, comparison with profit history of plaintiff's successor, comparison of similar businesses owned by plaintiff himself, and use of economic and financial data and expert testimony. *Id.* at 213–14, 371 S.E.2d at 536.

At trial, Global's president, David Wedel, testified the West Coast market in the relevant time period experienced a 590% increase in sales. Wedel further testified the East Coast market should have performed similarly, and would have, but for Halbersberg's intentional infringement. Wedel reasoned the comparison between the East Coast market and the Southern California market was the reasonable comparison to make, primarily because both were tourist beach resorts. This evidence supports the trial court's findings.

## C. Research and Development Costs

Halbersberg also disputes Global's recovery of research and development costs. He insists Global would have incurred them whether he copied its product or not. Halbersberg, however, fails to cite any authority for this argument.

The trial court found that Global lost the effective benefit of its promotional expenditures due to Halbersberg's misappropriation of Global's trade dress and trademarks. The court awarded Global $76,267.93 in damages including $29,000 for a package design fee, $16,000 for a trade show, $16,800 for

Wedel's time spent developing the packaging and $14,467.93 paid to a public relations firm.

▮▮▮ The UTPA permits recovery of actual damages. S.C.Code Ann. § 39–5–140(a) (1976). Actual damages under the UTPA include special or consequential damages that are a natural and proximate result of deceptive conduct. *Taylor v. Medenica,* 324 S.C. 200, 479 S.E.2d 35 (1996).

There is other authority that supports the trial court's decision to award Global its research and development costs. One found liable to another for trademark infringement is "liable for the pecuniary loss to the other caused by the deceptive marketing or infringement. . . ." *Restatement (Third) of Unfair Competition* § 36(1) (1995). The pecuniary loss for which damages may be recovered includes lost sales, losses from sales at reduced prices, harm to the market reputation of the plaintiff's goods, services, business, or trademark, and corrective advertising expenditures. *Id.* at § 36(2).

> The defendant's infringement or deceptive marketing may diminish the market reputation of the plaintiff's trademark, goods, services, or business. The threat to reputation may be direct, as when the defendant misrepresents the quality of the plaintiff's goods in comparative advertising, or indirect, as when the defendant sells inferior goods under the plaintiff's trademark. In both instances the plaintiff may lose future sales because of the misrepresentation even after the defendant's misconduct has ceased. Such reputational injury, if proved with sufficient certainty, is a recoverable loss . . . .

*Id.* at § 36 cmt. e.

> Recoverable damages include compensation for all injury to plaintiff's property or business which is the natural and probable consequence of defendant's wrong. This includes injury to business standing or good will, impairment of the good will of a trade-mark, loss of business or loss of profits on lost sales, loss from the reduction of the price of goods due to defendant's wrong, additional expenses incurred because of the wrong, including the cost of defending a groundless and intentionally vexatious action brought against plaintiff by defendant, and all other elements of injury to the business.

87 C.J.S. *Trade–Marks, Trade–Names, and Unfair Competition* § 216, at 617–18 (1954) (footnotes omitted).

There was testimony that Global invested considerable time and expense in developing unique packaging for its product in 1989 and 1990. By producing a substantially identical product, Halbersberg prevented Global from realizing the full benefit of its investment. The award for lost profits in 1992 was not the full measure of Global's damages. Unfortunately, Global expended large amounts of sums to develop and market a unique product that was misappropriated by Halbersberg. There was also testimony that Halbersberg's product was inferior to Global's product. Under the circumstances, we cannot say the trial court erred in awarding Global these damages.

## V. ATTORNEY FEES

### A. Amount

Halbersberg contends the trial court erred in awarding Global one-third of the trebled damage award rather than basing the fee on the amount and type of work that Global's counsel performed.

The general rule is that attorney fees are not recoverable unless authorized by contract or statute. *Hegler v. Gulf Ins. Co.*, 270 S.C. 548, 243 S.E.2d 443 (1978). The UTPA permits a successful plaintiff to recover reasonable attorney fees and costs. S.C.Code Ann. § 39–5–140(a) (1976). When determining reasonable attorney fees, the court should consider the following six factors: (1) the nature, extent, and difficulty of the case; (2) the time necessarily devoted to the case; (3) professional standing of counsel; (4) contingency of compensation; (5) beneficial results obtained; and (6) customary legal fees for similar services. *Id.*

Global had a modified contingency contract with its attorneys that provided for a $5000 retainer and 40% of any recovery obtained against Halbersberg. The trial court considered the six factors and then awarded Global $311,819.19, one-third of the total damages against Halbersberg. The trial court determined the case presented numerous and complex issues, requiring time-consuming research and trial prepara-

tion. The court determined that Global's counsel was in excellent standing. The court recognized that the attorney was to receive 40% under the contract but reduced that amount to a one-third recovery. The court found that Global's attorney had obtained a favorable result. Lastly, the court found that contingent fee arrangements were common in complex cases and found that the typical range of such contingency fees was one-third to one-half the recovery.

On appeal, an award for attorney fees will be affirmed so long as sufficient evidence in the record supports each factor. *Jackson v. Speed,* 326 S.C. 289, 486 S.E.2d 750 (1997). We find that there is sufficient evidence in the record to support each factor that the trial court considered.

## B. Constitutionality

Halbersberg also claims the UTPA provision which permits the recovery of attorney fees for a prevailing plaintiff violates the equal protection clauses of the South Carolina Constitution and the United States Constitution. After oral argument in this case, Halbersberg moved to supplement the record on appeal to include two documents indicating that the issue of the constitutionality of an award of attorney fees under the UTPA had been raised below. Halbersberg wanted to supplement the record on appeal with (1) a memorandum in opposition to the master's report, dated March 27, 1996 and (2) an excerpt of a pretrial brief dated August 28, 1996, prepared in anticipation of the second master's hearing.

Global acknowledged that the issue of the constitutionality of the attorney fees was raised at these two levels, but objected to the inclusion of the entire documents as a supplement to the record on appeal.

This court issued an order stating that it considered Halbersberg's motion and Global's response to amount to a stipulation by the parties that the issue of the constitutionality of the award of attorney fees under the UTPA was raised at two points in the proceedings below; first, in a memorandum filed with the circuit court in opposition to the adoption of the initial master's report and, second, in the pretrial brief filed with the master prior to the second master's hearing.

Despite the parties' stipulation, this issue is not preserved for our review. After the first hearing, the master determined that Global was entitled to reasonable attorney fees to be determined at a later hearing. Halbersberg did not raise the issue of the constitutionality of the attorney fees to the master and did not raise it in his exceptions to the master's report that contained 84 specifications of error. Therefore this issue is not adequately preserved for our review. *See Noisette v. Ismail,* 304 S.C. 56, 403 S.E.2d 122 (1991) (Where a matter is not ruled on by the trial court, the issue is not preserved for appellate review unless the complaining party moves to amend the judgment pursuant to Rule 59(e), SCRCP.).

**AFFIRMED IN PART AND REVERSED IN PART.**

GOOLSBY and HEARN, JJ., concur.